Cora J. DAVIS, also known as Mrs. W. A. Davis, and Irvine J. Vawter, Appellants,

v.

Loyd MANN, D. Perkins Cobb, Harry Gradour, M. L. Shipley and C. H. Alberding, Appellees.

No. 5289.

United States Court of Appeals Tenth Circuit.

May 18, 1956.

ing and developing the same for oil and gas mining purposes. And parties of the second part hereby acknowledge that the oil and gas deposits under said premises together with the right to prospect and develop said premises for oil and gas mining purposes are vested in said parties of the first part and that the same are excepted from the operation of this conveyance.

"But it is understood that if the parties of the first part, their heirs or assigns, should develop said premises for oil and gas mining purposes that they shall pay to parties of the second part their heirs or assigns a cash royalty of $100 per year for each gas well the product of which is used off the premises and they shall deliver as royalty one-eighth of all oil produced on said premises."

In October 1924, the Davises executed an oil and gas lease on a portion of the lands to John G. Phillips. This lease was recorded and later released without any development. The husband died in February 1936, and the wife was appointed executrix of his estate. In her inventory filed in the County Court, she omitted any reference or itemization of any oil or gas rights in and to the property now in controversy.

In 1953, Clark S. Moore, the fee owner of the property by mesne conveyance from the Davises, executed an oil and gas lease covering the same. The assignees of such lease entered upon the property, and in 1954 drilled and completed oil wells thereon. After completion of the wells and in March 1955, Cora Davis executed a lease covering the same property to appellant, Vawter, whom the trial court found knew or should have known of the appellee's leasehold interest.

On these facts the trial court found that the Davises, their successors and assigns, were obligated within a reasonable time to develop said premises for oil and gas purposes for the benefit of the grantees in said deed; their successors and assigns; that their failure to do so for a period of forty-four years effect-

B. W. Tabor, Tulsa, Okl. (John Pendleton, Nowata, was with him on the brief), for appellants.

R. L. Davidson, Jr., Tulsa, Okl. (J. B. Houston, G. B. Klein and Garland Keeling, Tulsa, Okl., were on the brief), for appellees.

Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The sole question on this appeal is whether a reservation in a conveyance denominated a "Warranty Deed" is in legal effect a determinable oil and gas lease, as the trial court held, or a mineral deed, as the appellants contend. The facts are not in dispute.

On July 30, 1910, Cora J. Davis and her now deceased husband, W. A. Davis, executed a "Warranty Deed" to lands located in Nowata County, Oklahoma, reserving "unto themselves, their heirs and assigns, the oil and gas deposits under said premises for the purpose of prospect-

ed a termination and extinguishment of all the right, title, interest and estate reserved unto them in their warranty deed of 1910. This appeal is from the judgment of the court quieting the appellees' title to their oil and gas lease.

While under controlling Oklahoma law, oil and gas are incapable of absolute ownership in place, they are nevertheless severable as a separate interest or right in the lands of which they are a part, with the exclusive right, subject to legislative control, to explore, produce and convert to possession as personal property of the possessor. And, such right may be created by grant or reservation. Barker v. Campbell-Ratcliff Land Co., 64 Okl. 249, 167 P. 468, L.R.A.1918A, 487; Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 3 A.L.R. 352; Crain v. Pure Oil Co., 8 Cir., 25 F.2d 824; United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194; Continental Supply Co. v. Marshall, 10 Cir., 152 F.2d 300; Phillips Petroleum Co. v. Jones, 10 Cir., 176 F.2d 737. Indeed, the appellees freely concede the severability of the mineral estate, and further sharpen the issue by also conceding that the first paragraph of the reservation in the deed "standing alone, would have created in the grantors a severed mineral interest and estate, unconditionally and with no obligation to prospect and develop for oil and gas purposes." They contend, however, that "the addition of the second paragraph so changed things that grantors and their successors were obligated within a reasonable time to explore and develop the premises for oil and gas, and that their failure to develop the same amounted to an extinguishment of their reserved interest." In other words, the contention is that the second paragraph in the reservation had the legal effect of creating in the appellants an estate in the nature of an oil and gas leasehold with the usual provisions for the payment of royalties and implied covenants to protect from drainage and to develop within a reasonable time.

This "Warranty Deed" is said to be decisively similar to the "'Oil and Gas Deed'" in Crain v. Pure Oil Co., supra [25 F.2d 825], involving the identical question whether an instrument called a "Deed" was in legal effect an oil and gas lease. The instrument there recited that for and in consideration of one dollar and further considerations thereafter stated, the parties of the first part bargained and sold to party of the second part, his heirs and assigns, all the oil and gas and all other minerals beneath the surface of the described property. The instrument further provided that if oil and gas be found on the premises by the grantee, his heirs or assigns, in paying quantities, the producing and marketing of the same should begin within one year from the date of discovery and continue so long as the second party deemed it profitable. It further provided that the grantee should pay to the grantor, his heirs and assigns, five percent of the value of all the oil produced from the land and $50 per annum for each gas-producing well, if the gas was sold. The instrument granted the right to so much of the surface as was necessary to develop and operate the premises with the right to remove all equipment and fixtures placed thereon. The court was satisfied that the first part of the instrument which "bargained and sold" all the oil and gas and other minerals beneath the surface of the land "to have and to hold forever", standing alone, would operate to convey a mineral fee in the land. But, looking at the whole instrument in its contemporary setting to ascertain and effectuate the intention of the parties, the court concluded that "Whatever these instruments may technically be called, it seems clear, from all the terms thereof and the circumstances surrounding the transactions, that the intention of the parties thereto was merely to grant rights to go upon the lands, prospect for oil and gas and other minerals, and, if found, to develop the same and pay royalties thereon to the owners of the lands; hence they were nothing more than min-

ing leases"; and that the failure to develop for an inordinate length of time worked a forfeiture of same. The court was brought to its ultimate conclusions by a consideration of the express covenants in the instrument with respect to development of the premises for oil and gas, saying that if the instrument of conveyance was not a lease, the provisions with respect to the rights and duties of the grantee were "superfluities". The court also thought it significant that in the absence of the development and the payment of royalties provided in the deed, the grantors would receive only $1.00 for their mineral interest "and no other benefit."

And, reliance is also placed upon Eastern Kentucky Mineral & Timber Co. v. Swann-Day Lbr. Co., 1912, 148 Ky. 82, 146 S.W. 438, 46 L.R.A.,N.S., 672, involving the question whether a deed purporting to grant, bargain and sell seven-eighths of the minerals and timber, the grantors reserving one-eighth of the minerals and timber outside the seven-eighths, operated to convey a fee simple interest in the timber and minerals or merely a right thereto upon the condition that they commenced development within a reasonable time. Emphasizing that the primary consideration for the grant was the obligation upon the part of the grantee to return one-eighth of the profits from the development of the property, the court concluded that the instrument called a deed was in legal effect a lease terminable upon failure to develop within a reasonable time. But the court was careful to recognize a "marked difference between the construction and effect of a conveyance of timber and minerals * * * for a stipulated consideration, payable in cash * * * or in some other valuable property, and the construction and effect of a conveyance in consideration of a royalty or per cent., to be paid out of the income derived by the grantees from the property conveyed." Id. 146 S.W. at page 441.

Unlike these cases, in our case there was no grant of the mineral rights or estate; no new right was created and initially vested in Davis and his wife to develop the premises. That right was vested in them prior to the execution of the deed and it remained with them after they conveyed the surface estate. In mutual recognition of that right, the provisions in the deed recited in clear language that Davis and his wife as owners of the mineral estate had the right at any time to develop the premises for oil and gas. The only limitation upon that right was the understanding or agreement that "if" the Davises "should" develop the premises for oil and gas mining purposes, they would pay the grantees or their assigns a stipulated royalty. The agreement to pay royalty was not the primary consideration for the reservation from the conveyance.

Judged therefore by the considerations which prompted the courts in the Crain and Eastern Kentucky cases, our case must be said to have more of the attributes of an absolute grant or reservation than a leasehold estate. It is decidedly more like Duncan v. Mason, 239 Ky. 570, 39 S.W.2d 1006, 1007, wherein for a "substantial" cash consideration, the grantors conveyed to an operating company the mineral rights under certain lands, the grantees agreeing "as a further consideration" to pay to the grantors a stipulated amount "on each ton of asphalt mined on this land after 50,000 tons had been taken therefrom." The court thought the instrument a complete conveyance for a valuable consideration, severing the mineral estate and vesting it in the grantee with the right to go upon the property and explore the same. Drawing a clear distinction between that case and the Eastern Kentucky case, where "the real consideration was one-eighth of the net profits", the court concluded that whatever the instrument might be called, the controlling intention of the parties was to effect a sale of the mining property, and that this was so notwithstanding the provisions for the payment of a stipulated tonnage royalty. And see also Kentucky Natural Gas Corp. v. Carter, 303 Ky. 559, 198 S.W.2d 311.

These cases serve to illustrate one salient precept, namely, that we are not concerned so much with nomenclature as with substance; that labels are often confusing in the ultimate determination of content—the legal relations the instrument creates. "The name given to an instrument does not necessarily determine its character 'the intent of the parties as revealed in and as effectuated by the entire language of the instrument must determine its legal definition.'" Kulp Oil & Gas Rights, § 10.11, p. 543. Neither are we concerned with the nice and ancient distinction between "reservation" and "exception" to determine the character, extent or quality of the estate conveyed. Burns v. Bastien, 174 Okl. 40, 50 P.2d 377, 382; Kulp Oil & Gas Rights, § 10.6, pp. 515, 517.

We know from the adjudicated cases that agreements to account for a percentage of the minerals as if and when produced from the estate granted or reserved as a primary consideration for the conveyance, with covenants for development, is certainly cogent evidence of an intention to grant or reserve a determinable estate in the nature of a lease. But we also know equally well that the mere agreement to pay royalty out of the thing granted or reserved prior to a lease, is not repugnant to the grant or reservation, and does not of itself convert it into a determinable estate. See 3 Summers Oil & Gas, Perm.Ed., § 572, p. 348, and § 599, p. 473; 1A Summers Oil & Gas, § 132, pp. 209, 215. "The mere fact that the mineral rights are thereby divided, with the right to receive a royalty upon production vested in one person, and the right to produce vested in another, is not sufficient of itself to establish a 'lease' relationship between the two parties." Walker, Express Clauses in Oil and Gas Leases Affecting the Usual Implied Obligations of the Lessee, 13 Miss.L.J. 292, 293. It has been suggested that royalty must be the inducing cause and development the principal purpose before the mere reservation or grant of a royalty will cause the transaction to result in a lease. i. e. see Hoffman, Comments on Determination of Whether an Instrument Is a Lease or an Absolute Conveyance of Oil and Gas, 25 Tex.L.J. 157, 162.

Viewed in the light of its contemporary setting, the agreement to pay royalty before the leasing of a mineral fee is not unique in form or legal effect. 3 Summers Oil & Gas, Perm.Ed., § 599, p. 473. Illustrative is McIntosh v. Vail, 126 W. Va. 355, 28 S.E.2d 95, 96, wherein the West Virginia court dealt with a contemporary deed in which the grantor reserved from the conveyance all of the oil and gas under the land conveyed with the customary privileges incident to development, provided that " 'in the event of oil or gas being developed on said land, said second party or his assigns shall be entitled to one full sixteenth of all oil marketed and one half of the net proceeds from all gas sold from said land.' " The court thought that the "aggregate effect of the deed is to convey to the grantee the land, including a right to one-sixteenth of all oil marketed and one-half of the net proceeds of all gas sold therefrom, and to save to the grantor all other interest, right and title to the oil and gas." In other words, "what is not saved to the grantor is effectively conveyed to the grantee." That court called the right thus conveyed to the grantee a "familiar form of royalty". And, such right was more specifically termed a "perpetual non-participating royalty" in Denver Joint Land Bank v. Dixon, 57 Wyo. 523, 122 P.2d 842, 844, 140 A.L.R. 1270, where the grantors also reserved the minerals with rights of exploration and development, but agreed to deliver a fractional part of all minerals produced and saved. And see Hanson v. Ware, 224 Ark. 430, 274 S.W.2d 359, 46 A.L.R.2d 1262.

The nature of the interest granted or reserved and called "royalties" has been provocative of much litigation and certainly cannot be said to be capable of exact classification or precise definition. See Annotations 131 A.L.R. 1371; 151 A.L.R. 818; 4 A.L.R.2d 492; 3 Summers Oil & Gas, Perm.Ed., § 522,

p. 348. Mason, Mineral Rights or Royalties? 18 O.B.A.J. 1739. Yet, the word is generally understood to designate a distinct beneficial interest in future production, but not embracing title to the minerals in fee or any right to join in leases or to share in delay rentals or bonuses. It is nevertheless a profit in the land—an incorporeal hereditament—a beneficial interest and enforceable as such. Dunlap v. Jackson, 92 Okl. 246, 219 P. 314; Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773; Pauly v. Pauly, 198 Okl. 156, 176 P.2d 491; 3 Summers Oil & Gas, Perm.Ed. § 572, p. 349 and § 581, p. 370. The right to explore, develop and operate is the dominant right; the right to participate in any production or the proceeds thereof as if and when produced is the servient right.

There is a dearth of Oklahoma authorities on the extent of the correlative rights and duties of one having the exclusive right or power to develop and produce, and one having the servient right to a share in the production from such exploration and development. But the dominant interest undoubtedly carries with it the correlative duty to protect the servient interest from waste. An eminent authority in the field would go so far as to raise an implied covenant to develop as if a lessor-lessee relationship existed, and roundly criticizes those cases which draw a distinction between the rights and duties of lessors and lessees and grantors and grantees of mineral interests. See Merrill, Covenants Implied in Oil and Gas Leases, 2d Ed., §§ 184, 185, p. 408. Dr. Merrill would imply a covenant regardless of the form of the instrument when "the right to exploit the oil is placed in one man's hands and the right to share in the production is placed in another's"; he takes the position that the fundamental purpose of the doctrine of implied covenants is "to prevent the operator from serving his own ends at the expense of the nonoperator's legitimate claims. * * *" See Merrill, Implied Covenants Between Others Than Lessors and Lessees, 13 O.B.A.J., p. 35, 27 Wash. Law Q. 155.

Another eminent Oklahoma authority on oil and gas law would treat the exclusive right to develop as a power coupled with an interest or a statutory "power in trust", and require the holder to exercise it with a rightful regard for the "nonparticipating royalty interest". See Kuntz, The Rule Against Perpetuities and Mineral Interests, 8 Okl.L. Rev. 185. Cases which recognize an implied covenant of development between dominant and servient mineral interests, other than oil and gas leases, but favoring the implied covenant to develop under an ordinary oil and gas lease, do so on the familiar ground that the lease is usually for a limited time with reversionary provisions; and upon what is said to be the more compelling fact that exploitation and development of the lease is the predominating purpose and the primary consideration therefor. See Danciger Oil & Ref. Co. v. Powell, 137 Tex. 484, 154 S.W.2d 632, 137 A.L.R. 408; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890; Annotations 137 A.L.R. 415 and 60 A.L.R. 901.

Whatever process of reasoning we employ, we are inevitably brought to the ultimate and decisive question whether an implied covenant or duty to develop the premises is essential to the effectuation of the ascertained intent of the parties. The lodestar for decision is, what was in the minds of the parties when they came to write their contract? Obviously, we will not imply a covenant which was not within the contemplation of the parties, for to do so would make a contract for them. Witt v. Westheimer, 182 Okl. 645, 79 P.2d 250. And see Kroeger v. Martin, 72 Okl. 198, 180 P. 955.

To be sure, Dr. Merrill recognizes a transaction in which the parties do not contemplate that the resultant owner of the dominant mineral estate with exclusive power to develop and produce will "embark upon a career of exploitation or development, and there is no reason for implying any covenant to do so since fair dealings do not call for it."

Merrill, Implied Covenants Between Others Than Lessors and Lessees, 13 O.B. A.J. p. 39. We think Dr. Merrill therein hypothetically stated our case. Here, as he supposed, the primary purpose of the transaction was to convey the surface of the land for agricultural pursuits. The grantor reserved the dominant mineral estate with the exclusive right to develop, but the parties obviously did not contemplate that he would develop and produce the property. Cf. Jackson v. Texas Company, 10 Cir., 75 F.2d 549. We take judicial notice of the fact that lands in Oklahoma are usually develped for oil and gas by means of leases, and that as a rule owners do not develop it. Burns v. Bastien, 174 Okl. 40, 50 P.2d 377. A leasing of the mineral interest was therefore contemplated as the means of exploring and developing the premises. And, the Davises did execute a lease to that end on a portion of the premises, apparently without any objection or contest of their right to do so. Indeed, it must be assumed that the leasing was in exercise of their exclusive right to do so. Certainly the mere right to participate in the production if the owners of the dominant mineral interest should develop the premises does not carry with it the right to execute a lease, even in the face of a breach of an implied duty to develop.

We conclude that by whatever name the reserved interest of the grantor may be called, it constituted the mineral estate in the land, subject only to an obligation to account for a stipulated part of the oil or gas, if the owner of the mineral interest should develop it; that if such mineral estate is the proper subject of an implied covenant to develop for the benefit of the owner of the right to share in the product of the development, the parties to this transaction did not intend to create any such obligation. If, however, a covenant may be implied in law and fact, such right was not enforceable by a declaration of forfeiture and a leasing, but by resort to equitable processes after appropriate notice and demand. Kunc v. Harper-Turner Oil Co., Okl., 297 P.2d 371.

The judgment is reversed.